**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 15 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NORMAN LEE NEWSTED,

      Petitioner - Appellee/
      Cross-Appellant,

      v.

GARY E. GIBSON, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellant/
      Cross-Appellee.

Nos. 97-5154 & 97-5159

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 91-CV-914)**

---

Sandra D. Howard, Assistant Attorney General (W. A. Drew Edmondson, Attorney General of Oklahoma, with her on the briefs), Oklahoma City, Oklahoma, for Appellant - Cross-Appellee.

Richard L. Gabriel, Holme Roberts & Owen, Denver, Colorado (Jon Bernhardt, Wilson & Mayhan, Denver, Colorado, and Madalene A. B. Witterholt, Crowe & Dunlevy, Tulsa, Oklahoma, with him on the briefs), for Appellee - Cross-Appellant.

---

Before **ANDERSON**, **TACHA**, and **BALDOCK**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

Norman Lee Newsted was convicted in Oklahoma of the first degree murder of taxi driver Lawrence D. Buckley and sentenced to death. After pursuing all available state remedies, Mr. Newsted filed this 28 U.S.C. § 2254 habeas petition, which the district court conditionally granted on two issues, ordering that the writ would issue unless the Oklahoma Court of Criminal Appeals granted Mr. Newsted a new appeal within six months of the date of the order. The state has appealed that decision, and Mr. Newsted has cross-appealed the district court's denial of relief on numerous other issues raised in the petition. The district court granted a stay pending the resolution of these appeals. We reverse the grant of the writ and remand for entry of an order denying the petition in its entirety.

## BACKGROUND

On February 20, 1984, Mr. Newsted arrived by plane at the Tulsa, Oklahoma, airport, where he summoned a cab driven by Mr. Buckley. Mr. Newsted directed Mr. Buckley to drive him to his sister's house at an address in west Tulsa. After driving around for some time unsuccessfully trying to locate the address, Mr. Buckley stopped at a gas station to ask for directions.

Mr. Newsted purchased a beer, and the clerk noticed he appeared to have no money in his wallet. Mr. Buckley purchased a packet of cigarettes.

Mr. Buckley next stopped at the Calvary Temple of God Church, where Mr. Newsted telephoned his sister and asked her to pick him up. Witnesses leaving the church reported seeing Mr. Newsted and Mr. Buckley in the northeast corner of the parking lot standing beside the taxi cab with the trunk open. Other witnesses reported hearing two loud noises shortly thereafter.

When Mr. Newsted's sister arrived at the church, Mr. Newsted approached her car from the east end of the parking lot and told her that the cab driver had pulled a gun and attempted to rob him. While his sister drove him to her house, Mr. Newsted told her that he had shot someone.

The next morning the church minister discovered Mr. Buckley's cab partially submerged in a creek running beside the east end of the church parking lot. He notified police, who discovered Mr. Buckley inside, dead from two gunshot wounds to the back of his head. After he was arrested, Mr. Newsted told police that he had shot Mr. Buckley after Mr. Buckley pulled a knife on him and attempted to rob him.

Mr. Newsted was subsequently charged with the premeditated or felony murder of Mr. Buckley. The jury found him guilty of first degree murder in the guilt/innocence phase of the trial and, following the sentencing phase,

recommended imposition of the death penalty. In imposing the death penalty, the jury found two aggravating circumstances: (1) Mr. Newsted had been convicted of a previous felony involving the use or threat of violence against a person, and (2) the existence of a probability that Mr. Newsted would commit criminal acts of violence that would constitute a continuing threat to society. His conviction and sentence were affirmed on direct appeal. Newsted v. State, 720 P.2d 734 (Okla. Crim. App. 1986), cert. denied, Newsted v. Oklahoma, 479 U.S. 995 (1986). He thereafter filed an application for post-conviction relief in state court, and an evidentiary hearing was held, focused primarily on Mr. Newsted's claim of ineffective assistance of counsel. His application was denied. Mr. Newsted thereafter filed a supplemental application for post-conviction relief, which was also denied. The Oklahoma Court of Criminal Appeals affirmed the denials of his post-conviction applications, and the United States Supreme Court again denied certiorari. Newsted v. Oklahoma, 501 U.S. 1259 (1991).

On November 26, 1991, Mr. Newsted filed a petition for writ of habeas corpus along with a motion to hold the petition in abeyance pending exhaustion of state remedies. The federal district court ordered the petition held in abeyance. Mr. Newsted then filed a second application for post-conviction relief in state court, an evidentiary hearing (the second) was held, and the application was denied. The Oklahoma Court of Criminal Appeals affirmed that denial. Newsted

v. State, 908 P.2d 1388 (Okla. Crim. App. 1995). On April 22, 1996, Mr. Newsted filed an amended petition for a writ of habeas corpus, alleging ten claims for relief arising out of the guilt/innocence and the sentencing phases of the trial, as well as ineffective assistance of appellate counsel. The federal district court held a hearing and ordered supplemental briefing on Mr. Newsted's claims for relief under Mills v. Maryland, 486 U.S. 367 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990).

The district court denied relief on all claims relating to the sentencing phase except for Mr. Newsted's claim that the court's instructions on mitigating circumstances created a "reasonable likelihood that the jurors . . . understood the instructions to preclude consideration of mitigating evidence unless it was found unanimously," in violation of Mills and McKoy. Order at 37, R. Vol. III at Tab 36. On that ground the court concluded that Mr. Newsted's "death penalty was imposed unconstitutionally." Id. The district court also denied relief on all claims arising out of the guilt/innocence phase of the trial except Mr. Newsted's claim that his appellate counsel was ineffective for failing to raise on direct appeal the omission of a lesser included offense instruction on manslaughter committed in the heat of passion, which the court concluded would have been a "dead-bang winner" on appeal. Thus, the district court concluded:

> that the instructions given to the jury during the sentencing phase
> violated the requirements of the Eighth Amendment, as articulated in

> Mills v. Maryland, and that Petitioner's appellate counsel was constitutionally ineffective in violation of the Sixth Amendment as articulated in Strickland v. Washington. As a result of these constitutional violations, the Court holds that Petitioner is entitled to habeas corpus relief in the form of a new direct appeal . . . .

Id. at 61-62 (footnote omitted).

As indicated, both parties appeal. The state appeals the district court's conclusion that Mr. Newsted's appellate counsel was ineffective in failing to raise on direct appeal the argument that the jury was entitled to an instruction on heat of passion manslaughter and its conclusion that the jury instructions on mitigating circumstances were unconstitutional. Mr. Newsted cross-appeals, arguing the district court erred in: (1) finding that, although the state violated Brady v. Maryland, 373 U.S. 83 (1963), when it failed to disclose prior allegedly inconsistent statements of a state witness at the penalty phase, Mr. Newsted was not prejudiced thereby; (2) finding that, although the state failed to provide notice of its intention to introduce evidence of unrelated homicides at the penalty phase of the trial, Mr. Newsted was not prejudiced thereby; (3) finding that, although Mr. Newsted's counsel provided constitutionally deficient representation during the penalty phase, Mr. Newsted was not prejudiced thereby; (4) failing to vacate Mr. Newsted's conviction after concluding that the trial court erred in failing to instruct the jury on heat of passion manslaughter and the evidence supported such an instruction; and (5) finding that, although the state violated Brady when it

failed to disclose to Mr. Newsted a police report allegedly corroborating his account of the crime, Mr. Newsted was not prejudiced thereby and that Brady did not apply at all to a police officer's statements concerning a knife at the crime scene.

## DISCUSSION

In reviewing the grant or denial of a habeas petition we accept the district court's factual findings unless they are clearly erroneous, and we review its legal conclusions de novo. Wildermuth v. Furlong, 147 F.3d 1234, 1236 (10th Cir. 1998). Because this case was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and because Oklahoma is not a qualifying state for purposes of the special provisions of the AEDPA applicable to capital cases, we apply pre-AEDPA law to this case.

### 1. State's Appeal

### A. Ineffective assistance of appellate counsel in connection with failure to instruct on heat of passion manslaughter

As indicated, Mr. Newsted was charged with first degree murder. His basic defense was that he shot Mr. Buckley after Mr. Buckley attempted to rob him. The jury was instructed on the defense of self defense and on manslaughter in the first degree as a lesser included offense. The court did not give a heat of passion

manslaughter instruction, as permitted by Okla. Stat. Ann. tit. 21, § 711(2).[1] On direct appeal from his conviction, Mr. Newsted's counsel did not argue that it was error to fail to give such an instruction. In his second state post-conviction proceeding, Mr. Newsted raised the issue for the first time. The Oklahoma Court of Criminal Appeals considered it technically barred, but reviewed it in the context of Mr. Newsted's claim of ineffective assistance of appellate counsel and held that it failed to "meet both requirements of Strickland." Newsted, 908 P.2d at 1393. The federal district court held that appellate counsel was constitutionally ineffective under Strickland v. Washington, 466 U.S. 668 (1984), for failing to raise the heat of passion manslaughter instruction issue on direct appeal, and that Mr. Newsted suffered prejudice therefrom.

Claims of ineffective assistance of counsel present mixed questions of law and fact which we review de novo. Moore v. Reynolds, No. 97-6065, 1998 WL 387452, at *5 (10th Cir. July 13, 1998). When claiming ineffective assistance of

_____

[1]Okla. Stat. Ann. tit. 21, § 711(2), provides as follows:

> Homicide is manslaughter in the first degree in the following cases:
>
> . . . .
>
> 2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

counsel, a petitioner must establish both constitutionally deficient performance and prejudice—"a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different." Id. When a petitioner argues ineffective assistance of appellate counsel by failing to raise an issue on appeal, we first examine the merits of the omitted issue to determine if counsel's performance was deficient and, if it was, if the deficiency caused prejudice. If the omitted issue is meritless, appellate counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel. See United States v. Cook, 45 F.3d 388, 392-93 (10th Cir. 1995).

At the time of Mr. Newsted's trial, Oklahoma law provided that "in every . . . prosecution for murder, wherein the evidence necessitates an instruction upon self-defense, the trial court shall also instruct upon voluntary or first degree manslaughter committed in the heat of passion as a lesser included offense." Morgan v. State, 536 P.2d 952, 959 (Okla. Crim. App. 1975). An exception to the rule existed in cases where there was "uncontroverted proof from which the law presumes malice, e.g., homicide perpetrated in the commission of a felony." Id. Subsequent to Mr. Newsted's direct appeal, the Morgan rule was overturned as "too inflexible." Walton v. State, 744 P.2d 977, 978 (Okla. Crim. App. 1987). As explained by Judge Parks in his special concurrence in Walton, the preferred approach "allows for a case-by-case analysis . . . [under which] the trial court

must closely scrutinize each individual case to determine whether the facts warrant instructions on both self-defense and heat of passion." Id. at 979.

Mr. Newsted argues, and the district court held, that the Morgan rule in effect at the time of his trial and direct appeal provided him with a "dead-bang winner" and his appellate counsel's failure to argue it necessitates the grant of the writ.[2]  The state responds:  (i) the Oklahoma Court of Criminal Appeals already held that the issue was not meritorious, and certainly not a "dead bang winner," when it concluded that Mr. Newsted's counsel was not ineffective in failing to raise the issue and we should defer to that conclusion; (ii) Lockhart v. Fretwell, 506 U.S. 364 (1993), compels us to examine whether Mr. Newsted suffered any prejudice from his appellate counsel's ineffectiveness in light of current law and,

---

[2]As we recognized in United States v. Cook, 45 F.3d 388 (10th Cir. 1995), "an appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal." Id. at 395.  A "dead-bang winner" is "an issue which was obvious from the trial record, and . . . would have resulted in a reversal on appeal." Id.

The state argued that the district court should not reach the merits of this issue because Mr. Newsted failed to raise it on direct appeal and it is therefore procedurally barred.  This issue was raised in Mr. Newsted's second state post-conviction proceeding, and the Oklahoma Court of Criminal Appeals considered it only in the context of Mr. Newsted's claim of ineffective appellate counsel.  See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("State procedural bars are not immortal . . . ; they may expire because of later actions by state courts.  If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise have been available.").

since Morgan's absolute rule has been overturned, and the propriety of a heat of passion manslaughter instruction therefore requires an analysis of the evidence in the particular case, the issue is no longer a "dead-bang winner"; and (iii) the propriety of jury instructions in a state trial is a matter of state law, and therefore not a ground for granting habeas relief. We reject Mr. Newsted's argument, and the district court's conclusion, for multiple reasons.

### i. Oklahoma Court of Criminal Appeals' decision

The Oklahoma Court of Criminal Appeals' ruling on this issue was cursory. The issue involving the failure to give the heat of passion manslaughter instruction was denominated "Claim B" by that court. The court ruled summarily as follows: "[w]e have further considered the issues presented in Claims B, C, H, and L. Without addressing each on its merits, we find that none of them meet both requirements of Strickland. Consequently, appellate counsel was not ineffective in failing to raise these issues, and the issues are barred from further review." Newsted, 908 P.2d at 1393-94 (emphasis added).

Implicit in that conclusion is the determination that the issue was not meritorious under Oklahoma law, that is, the circumstances of the case did not warrant the giving of the instruction. That necessarily encompassed factual findings about the evidence in this case. Federal habeas courts must give great

-11-

deference to state factual findings.  See Williamson v. Ward, 110 F.3d 1508, 1513

n.7 (10th Cir. 1997) ("'[A] determination after a hearing on the merits of a factual

issue, made by a State court of competent jurisdiction . . . shall be presumed

correct' unless one of [] eight enumerated circumstances is established.") (quoting

28 U.S.C. § 2254(d)).  Thus, we could end our analysis here, deferring to the state

court's findings about this case.  However, it may also be argued that the court's

conclusory finding that the issue does not meet "both" requirements of Strickland

means that it *does* meet one requirement (either deficient performance or

prejudice) but not both.  This ambiguity compels us to proceed further with our

analysis.

### ii.  Deficient performance

We first consider whether appellate counsel's performance was deficient.

In light of the Morgan rule in effect at the time of Mr. Newsted's appeal, we

assume his counsel provided ineffective assistance by failing to raise it.  Thus, the

deficient performance part of Strickland has been met.  We then turn to prejudice

under Strickland.

### iii. Prejudice

In Lockhart v. Fretwell, the Supreme Court held that counsel's failure to make an objection which was supported by a case which was later overruled did not constitute prejudice under Strickland. Thus, the Court held that the prejudice inquiry under Strickland is conducted under current law, not under the law at the time of the original allegedly deficient performance. See Lucas v. Johnson, 132 F.3d 1069, 1078 (5th Cir. 1998) (noting that "the prejudice prong of the Strickland test is measured at the time the ineffectiveness assistance claim is raised"), petition for cert. filed, (U.S. June 8, 1998) (No. 97-9463). We must accordingly evaluate Mr. Newsted's allegation of prejudice from counsel's failure to argue on appeal the heat of passion manslaughter instruction issue in terms of current Oklahoma law.[3] To find prejudice, we must find that counsel's ineffectiveness created a "reasonable probability" that the outcome of the case would have been different. The essential question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart, 506 U.S. at 372.

---

[3]The district court held both that the omission of the heat of passion instruction was a "dead bang winner" under Morgan's absolute rule in effect at the time of Mr. Newsted's appeal, as well as a viable issue under Walton, because the circumstances of the case justified such an instruction. Under Lockhart, Morgan's absolute rule is irrelevant to Mr. Newsted's claim of prejudice. We therefore only consider prejudice under Walton.

In evaluating whether a petitioner claiming ineffective assistance of appellate counsel has established prejudice, we agree with the Fifth Circuit that our focus, with respect to the Lockhart prejudice analysis, must be on the reliability and fairness of the trial itself and the resulting conviction. "[T]he presence or absence of prejudice, both with respect to claims of ineffective assistance of counsel at the trial and appellate levels, hinges upon the fairness of the trial and the reliability of the judgment of conviction resulting therefrom." Goodwin v. Johnson, 132 F.3d 162, 174 (5th Cir. 1998). We do not simply examine whether the petitioner was likely to obtain a reversal of his conviction or a new trial on appeal. As the Supreme Court stated in Lockhart, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369.[4]

We conclude that appellate counsel's failure to make an argument concerning the trial court's failure to give a heat of passion manslaughter

_____

[4]As the court in Goodwin explained, the Supreme Court's recognition of the right to effective assistance of appellate counsel "stems from the fact that, when a state chooses to create appellate courts, appellate review becomes '"an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant."' The appellate process exists solely for the purpose of correcting errors that occurred at the trial court level." Goodwin, 132 F.3d at 175 (quoting Evitts v. Lucey, 469 U.S. 387, 393 (1985) (quoting Griffin v. Illinois, 351 U.S. 12, 18 (1956)).

instruction did not render "the result of the trial unreliable or the proceeding fundamentally unfair." Id. at 372. We reach this conclusion for two related reasons. First, under Walton, Mr. Newsted would only have the right to ask for a heat of passion manslaughter instruction, and the court would only be obligated to give such an instruction, if the evidence supported it. We have carefully reviewed the record in this case and conclude that the evidence would not have supported the giving of such an instruction. Second, we conclude that, had such an instruction been given, the jury would have reached the verdict that it did and convicted Mr. Newsted of first degree murder. There is no reasonable probability that it would have reached any other verdict, because the evidence overwhelmingly supported a first degree murder conviction. Indeed, the jury rejected the lesser offense of manslaughter, on which it *was* instructed. We have no doubt that it would have also rejected a heat of passion manslaughter option.

In reaching these dual conclusions, we rely on the following, as revealed by the record in this case: The only evidence supporting Mr. Newsted's claim that he shot Mr. Buckley after Mr. Buckley attempted to rob him was his own testimony to that effect. Against that, there was the evidence of the nature of Mr. Buckley's injuries—two gunshot wounds to the back of the head—which are inconsistent with Mr. Newsted's version of events; Mr. Newsted's own contradictory statements that Mr. Buckley had pulled a gun or a knife on him;

evidence supporting the fact that Mr. Newsted took Mr. Buckley's billfold with him at the time of the murder and discarded it later, near his sister's house; evidence suggesting Mr. Newsted had no money prior to the Buckley murder but had cash when he was arrested not long thereafter; testimony by witnesses who observed Mr. Newsted and Mr. Buckley minutes before the murder; testimony concerning Mr. Newsted's conduct and demeanor immediately following the crime; and the fact that there was little other objective evidence supporting Mr. Newsted's claim that he shot Mr. Buckley while he defended himself against a robbery attempt.[5]  The evidence is simply insufficient for a reasonable jury to conclude that Mr. Newsted acted in a heat of passion.  See Duvall v. Reynolds, 139 F.3d 768, 787 (10th Cir. 1998), petition for cert. filed, (U.S. July 31, 1998) (No. 98-5487) (reviewing the evidence and concluding that it did not support the giving of a heat of passion manslaughter instruction).

We therefore conclude that Mr. Newsted suffered no prejudice from the failure of his appellate counsel to raise the heat of passion manslaughter instruction issue.  There is no "reasonable probability" that the outcome of the case would have been different; the claimed ineffectiveness did not render "the result of the proceeding . . . fundamentally unfair or unreliable."  Lockhart, 506

---

[5]We discuss, infra, other arguments concerning evidence in this case which Mr. Newsted claims support his version of events.

U.S. at 369; see also Goodwin, 132 F.3d at 174 (holding that the claimed

ineffectiveness did not undermine the "fairness of the trial and the reliability of

the judgment of conviction resulting therefrom").[6]

## B. Adequacy of instructions on mitigating circumstances

The jury was given, in part, the following jury instructions in the penalty

phase of the trial:

> Mitigating circumstances are those which, in fairness and
> mercy, may be considered as extenuating or reducing the degree of
> moral culpability or blame.  The determination of what are mitigating
> circumstances is for you as jurors to resolve under the facts and
> circumstances of this case.

Instruction No. 7, R. Vol. II at Tab 32.

> If you unanimously find that one or more of the aggravating
> circumstances existed beyond a reasonable doubt, the law requires
> that you reduce such findings to writing by stating specifically what
> aggravating circumstances existed, if any.  This finding must be
> made a part of your verdict.

---

[6]The state's additional argument on this issue—that the necessity of giving
such an instruction is purely a matter of state law and therefore not grounds for
habeas relief—is easily dismissed.  This issue is appropriately raised in this
habeas petition because it arises in the context of a claim of ineffective assistance
of appellate counsel.  Mr. Newsted has a due process right to effective appellate
counsel.  See Evitts v. Lucey, 469 U.S. 387 (1985); see also Hannon v. Maschner,
845 F.2d 1553, 1558 (10th Cir. 1988).  Having concluded that he suffered no
prejudice from his counsel's failure to argue the issue on appeal, however, we
grant Mr. Newsted no relief in this habeas proceeding.

You must indicate this finding by checking the box next to such aggravating circumstances on the appropriate form furnished you, and such verdict must be signed by your foreman.

The law does not require you to reduce to writing the mitigating circumstances you find, if any.

Instruction No. 8, id.

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

Instruction No. 10, id.

The district court held that "there is a 'reasonable likelihood' that the jury interpreted the instructions to require it to find mitigating circumstances unanimously," Order at 36, R. Vol. III at Tab 36, in violation of Mills, McKoy, and Boyde v. California, 494 U.S. 370 (1990). The state argues that the district court erred in refusing to apply a procedural bar to this claim and in concluding, on the merits, that the claim warranted granting the writ. Specifically, on the merits of the claim, the state argues our recent decision in Duvall, in which we upheld virtually identical instructions against an identical challenge, compels the reversal of the district court's decision. We agree.

Without expressing any opinion on the procedural bar argument, about which there is considerable confusion and multiple sub-issues, we hold that Duvall directly controls the merits of this argument and requires us to uphold the

-18-

validity of the instructions given. Mr. Newsted asks us to reconsider <u>Duvall</u>. We do not, inasmuch as one panel of this court cannot overturn another panel's decision. See <u>Aramark Corp. v. NLRB</u>, Nos. 97-9535, 97-9550, 1998 WL 646974, at *10 (10th Cir. Sept. 22, 1998).[7]

### 2. Mr. Newsted's Cross-Appeal

### A. <u>Brady v. Maryland</u> violations

Mr. Newsted claims the district court correctly held that the state committed several violations of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), but that it erred in finding no prejudice therefrom. The Supreme Court held in <u>Brady</u> that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87; <u>see also</u> <u>Duvall</u>, 139 F.3d at 785. The materiality requirement is satisfied only

---

[7]In light of the frequency with which arguments are made concerning the adequacy and clarity of mitigating circumstances instructions given to Oklahoma juries in the penalty phase of capital cases, <u>see</u>, <u>e.g.</u>, <u>Duvall v. Reynolds</u>, 139 F.3d 768 (10th Cir. 1998); <u>Castro v. Ward</u>, 138 F.3d 810 (10th Cir. 1998); <u>Knighton v. State</u>, 912 P.2d 878 (Okla. Crim. App. 1996); <u>Romano v. State</u>, 909 P.2d 92 (Okla. Crim. App. 1995); <u>Smallwood v. Oklahoma</u>, 907 P.2d 217 (Okla. Crim. App. 1995), we urge Oklahoma state courts to instruct juries in such a way that there is no possibility of ambiguity in the manner in which those juries consider mitigating evidence. This frequently litigated issue will disappear, and we will have absolute confidence that Oklahoma juries carefully and properly discharge their important task of evaluating mitigating circumstances in capital cases.

"'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'. . . A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682, 678 (1985). We review de novo allegations of Brady violations. United States v. Woodlee, 136 F.3d 1399, 1411 (10th Cir. 1998), petition for cert. filed, (May 22, 1998) (No. 97-9239).

In this case, on March 5, 1984, Mr. Newsted's attorney filed a written request for "[a]ny sworn statements pertaining to this cause of any person taken by the District Attorney or his assistants, or any of their agents, including, but not limited to members of . . . the Cedar City, Utah Police Department . . . ." Ex. 18 at ¶ 1, R. Vol. II at Tab 11. He also sought "[a]ny and all evidence which exculpates or tends to exculpates [sic] the defendant . . . ." Id. at ¶¶ 2, 10. The state responded that it "is not in possession of and is totally unaware of any sworn statements of any person having as its subject matter the subject of the above-captioned action." The state then listed three items of exculpatory evidence: (1) "Defendant's own exculpatory statements toward police officers"; (2) Mr. Buckley's license to purchase a pistol; and (3) "[m]inor discrepancies in details of all witnesses [sic] testimony." Id., Ex. 19.

-20-

At issue in Mr. Newsted's cross-appeal are: (i) statements made by Cynthia Brosemer, who participated, along with Mr. Newsted, in the robbery and murder of three people in the Playhouse Bar in Cedar City, Utah, shortly before Mr. Buckley's murder; (ii) a Tulsa police report stating that there were signs of a struggle at the Buckley murder scene; and (iii) statements made later by a police officer at the scene that he remembered finding an open knife in the taxi. The state apparently did not disclose the above information to Mr. Newsted's counsel, who was unaware of it at trial.

### i. Cynthia Brosemer's statements

On February 14, 1984, Mr. Newsted, along with Doug Kaye and Cynthia Brosemer, robbed the Playhouse Bar in Cedar City, Utah. Ms. Brosemer turned herself in three days later, received immunity, and provided three statements to Cedar City police officer Roy Houchen and others concerning the crime. Details of her statements will be provided as relevant, but the essence of her statements as they relate to Mr. Newsted was that he participated in the robbery, he fired two non-fatal shots into the arm or shoulder of one of the victims, and that Doug Kaye executed the three victims by shooting them in the back of the head while Mr. Newsted and Ms. Brosemer looked on.

At the sentencing phase of Mr. Newsted's trial for the Buckley murder, the state called only Officer Houchen and Ms. Brosemer as witnesses. The state's apparent plan was to use evidence of the Utah murders to establish the aggravating circumstance that there was a probability that Mr. Newsted would commit acts of violence that would constitute a continuing threat to society. Mr. Newsted's counsel objected, citing the Oklahoma rule providing that the state may not introduce evidence at a sentencing hearing unless it has given the defense adequate notice. The court permitted the witnesses to testify over defense counsel's objection.

Mr. Newsted argues that Ms. Brosemer's testimony during the penalty phase varied from her prior three statements, and permitted the inference that Mr. Newsted actually killed people in Utah. He further claims that the unavailability of her prior statements made it impossible to impeach her during the penalty phase. Thus, he argues the state's failure to disclose Ms. Brosemer's statements to him both severely hampered his ability to effectively cross-examine her during the penalty phase and gave the jury an inaccurate picture of Mr. Newsted's involvement in the Utah murders and thus an inaccurate impression of his future dangerousness.

The district court concluded that, although the statements were <u>Brady</u> statements and were not turned over to Mr. Newsted,[8] "had the Brosemer statements been disclosed to the defense, there is not a reasonable probability that the result of the sentencing phase would have been different." Order at 19, R. Vol. III at Tab 36. After carefully reviewing the Brosemer statements and her testimony at the sentencing phase of Mr. Newsted's trial, we affirm. We agree with the state and the district court that, while Ms. Brosemer's trial testimony was not identical to her prior statements, it was substantially the same, and adequately and accurately conveyed to the jury Mr. Newsted's involvement in the Utah murders.[9]

---

[8]There is some dispute as to whether all three statements were withheld. We will assume, for the sake of argument, that all three were withheld.

[9]For example, the following exchange occurred during Ms. Brosemer's cross-examination in the penalty phase:

Q. Did you testify in the case of Douglas Kay?
A. Yes.
Q. Did you testify in that trial that Douglas Kay was the one who shot and killed these people in the bar up there?
A. Yes.
Q. Norman Lee Newsted didn't kill anybody up there?
A. No, he shot a man twice.
Q. The man was still alive, wasn't he?
A. I believe so.
Q. He was shot in the arm, wasn't he?
A. Shot up on the shoulder-chest area.

Tr. Part II at 822. Officer Houchen confirmed the accuracy of that statement of
(continued...)

### ii. Sergeant Hunt's statements about knife

Mr. Newsted also argues the state violated <u>Brady v. Maryland</u> in failing to disclose to him evidence suggesting that an open knife was found at the murder scene which, he argues, would have bolstered his claim of self-defense. As indicated, Mr. Newsted's defense in this case was that Mr. Buckley tried to rob him at knife point, and he shot Mr. Buckley in self-defense in the ensuing struggle.

While a knife apparently belonging to Mr. Buckley was found at the crime scene, there was considerable confusion and conflicting testimony as to where it was found and who found it. As the district court stated, "from the beginning, the police officers who testified about the knife testified in a way that relieved each of them of the responsibility of finding or touching the knife at the scene." Order at 50, R. Vol. III at Tab 36. Our review of the record confirms the accuracy of the district court's recitation of the tortured history of this particular piece of evidence:

> The evidence log, prepared by Officer Ellis, states that the knife was recovered by John Ross of the Medical Examiner's office in the decedent's coat pocket. Mr. Ross stated that he never touched the

[9](...continued)

her testimony. <u>Id.</u> at 833-34. Particularly in light of counsel's forceful argument on the issue, we have also reviewed the entire closing argument of the prosecutor, and we do not conclude that he was able to use Ms. Brosemer's statements to mislead the jury as to Mr. Newsted's involvement in the Utah murders.

knife. On February 28, 1984, the District Attorney asked Officer Moreland to determine whether the knife was found open or closed. On March 1, 1984, Officer Moreland reported that the knife was found closed in the decedent's pants pocket.

Two weeks later, at the preliminary hearing, Officers Moreland, Park and Applegate testified about the knife. Officer Moreland testified that he saw the knife closed on the floor of the car, and that the knife was removed from the car by Officer Park. The District Attorney never disclosed Officer Moreland's March 1 report. Officer Moreland also testified that the knife was wet and muddy when it was recovered after the taxi was pulled out of the water. The knife was clean at the time of the preliminary hearing, and no one could explain how the knife came to be cleaned up. Officer Park testified that he saw the knife closed on the floor of the car, and that it was wet and muddy. Officer Applegate testified that the knife was found closed in the decedent's coat pocket, and that Officer Park handed the knife to Officer Applegate. No officer admitted to being the person that recovered the knife.

At trial, Officers Moreland and Applegate repeated their testimony from the preliminary hearing, namely that Officer Park recovered the knife. Officer Park testified that he saw the knife closed on the floor of the car, and that Officer Applegate or Officer Ellis recovered the knife. Officer Park specifically denied that he ever touched the knife at the scene. Once again, no officer admitted to being the person who recovered the knife.

Id. at 50-51 (citations omitted). Except for Mr. Newsted's testimony at trial that he shot Mr. Buckley after Mr. Buckley attempted to rob him with a knife, the jury heard no other testimony that the knife found at the scene was ever open.

Mr. Newsted argues there was one investigating officer, Sergeant Roy Hunt, who retired shortly after the Buckley murder but, when contacted by an investigator for Mr. Newsted's counsel in 1991 and 1992, signed two statements

-25-

suggesting the knife was open at the crime scene, thereby supporting Mr. Newsted's version of events. Thus, Mr. Newsted argues that the state, in effect, suppressed Sgt. Hunt's belief at the time of the murder that the knife was found open.

The first statement Mr. Newsted cites in support of this argument was a report prepared by the investigator, Barry Rouw, who stated that "Seargent [sic] reported that to the best of his recollection the folding blade knife was recovered in the open position. When questioned further as to where the knife was recovered from Seargent [sic] Hunt stated that he was not sure and could not recollect positively where the knife was recovered from." Pet'r's Ex. P-63 at Tab H pp.1-2. Sgt. Hunt then signed the report, stating "it true to the best of my memory." Id. Four months later, Sgt. Hunt signed a statement which included the following: "I told Mr. Rouw that I recalled seeing the blade of the knife in an open position when it was recovered by the Tulsa Police Department. And, what I told Mr. Rouw, is exactly what I remember based upon my first-hand observations—the knife blade was open." Id. at Tab K.

However, Sgt. Hunt's supplementary offense report prepared at the time of the Buckley murder did not mention a knife. Moreover, at the evidentiary hearing held before the Oklahoma district court on August 25-26, 1992, in Mr. Newsted's second post-conviction proceeding, Sgt. Hunt initially characterized his

statements to investigator Rouw as "[w]e discussed it, whether [the knife] was open or whether it was closed. We batted it back and forth. I said, yeah, it could have been either way, just like anything, but I did not definitely say that the knife blade was open at any time. I said it could have been or it could not have been." Tr. of Evidentiary Hr'g at 73. He subsequently agreed, however, that his statements to Mr. Rouw that, "to the best of his memory" the knife was open, were correct at the time he made them in late 1991 and early 1992.

We agree with the district court that the record in this case "simply does not establish that Sergeant Hunt believed he saw an open knife at the crime scene." Order at 52, R. Vol. III at Tab 36. Further, as the district court also found, the evidence at trial and available to the state at that time overwhelmingly suggests the contrary. We therefore affirm the district court's conclusion that no Brady violation occurred in connection with Sgt. Hunt's beliefs or statements about the knife.

### iii. Police report suggesting struggle

One of the investigating officers, Det. Cpl. G. V. Moreland, prepared a supplementary offense report which contained the following description of Mr. Buckley:

> The victim's shirt had a tear in the area of the buttonhole for the top button. This tear appeared that the shirt had been ripped open, and

the buttonhole had been ripped all the way through and was no longer operable. Victim also showed signs of a possible struggle in that he had what appeared to be a fingernail scrape on his right cheek and another small cut on the right side of his neck.

Report, Pl's Ex. 20, R. Vol. II at Tab 11. This report was apparently never disclosed to the defense.

The district court held that the failure to disclose this report to the defense was a Brady violation. We agree, given its relevance to Mr. Newsted's defense. Thus, as did the district court, we turn to whether there is "a reasonable probability" that, had the report been disclosed to defense counsel, "the result of the proceeding would have been different." Kyles, 514 U.S. at 433-34.

The district court carefully detailed, as have we, all the evidence contradicting Mr. Newsted's version of events. We also note that no other investigating officer testified to or reported indications of a struggle.

Moreover, the forensic pathologist, Dr. M. F. Merchant, who performed the autopsy on Mr. Buckley, testified to the jury about the abrasions on Mr. Buckley's neck, and he stated twice that they could have been the result of "an altercation" or a "scuffle." Tr. Part II at 537, 542. Thus, the marginal additional information that one officer observed that Mr. Buckley's shirt looked like it had been sharply pulled at the neck does not create a "reasonable probability" that the jury would have reached a different result. We therefore affirm the district court's conclusion that this Brady violation caused Mr. Newsted no prejudice.

-28-

### iv. Cumulative effect of errors

Mr. Newsted further argues that we must consider the cumulative effect of the undisclosed evidence of both the open knife and the struggle, and, considered together, they "undermine confidence in the jury's verdict." Newsted's Opening Br. at 70. We have concluded that no error occurred in connection with Sgt. Hunt's beliefs, and that the Brady violation in connection with the police report suggesting a struggle was not prejudicial. A non-error and a non-prejudicial error do not cumulatively amount to prejudicial error. See Moore v. Reynolds, No. 97-6065, 1998 WL 387452, at *27 (10th Cir. July 13, 1998) ("Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors.").

### B. Notice of evidence to be used at sentencing

Mr. Newsted also argues the state violated his due process rights by failing to provide notice to him that it intended to rely upon the Utah homicides at sentencing or call Officer Houchen and Ms. Brosemer as witnesses. Oklahoma provides that "[o]nly such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible." Okla. Stat. Ann. tit. 21, § 701.10. The statute "requires the State to provide a capital defendant with 'a summary of the evidence intended to support the alleged aggravating

-29-

circumstances, and a list of witnesses the State might call' and not a detailed description of anticipated second stage evidence." Turrentine v. Oklahoma, No. F-95-1110, 1998 WL 264135, at *13 (Okla. Crim. App. May 27, 1998) (quoting Walker v. State, 887 P.2d 301, 316-17 (Okla. Crim. App. 1994)).

On May 16, 1984, the state filed a bill of particulars describing the evidence it intended to introduce in support of the two aggravating circumstances it intended to prove. In support of the aggravating circumstance that Mr. Newsted had been previously convicted of a felony involving the use or threat of violence to the person, the state described a 1979 conviction in Nevada for kidnaping, robbery, and use of a deadly weapon in connection with the commission of a crime. To support the "continuing threat" aggravator, the bill stated only that "from the past behavior of the defendant . . . there is the existence of the probability that this defendant would commit criminal acts of violence that would constitute a continuing threat to society." Pet'r's Ex. P-39, Doc. 39.

On June 18, 1984, the first day of trial, the state filed a "Notice of State's Intention to Introduce Evidence of Other Crimes" (the "Burks" notice)[10] in which it detailed the Utah murders and stated that evidence of them would be relevant to prove that the firearm used to kill Mr. Buckley belonged to Mr. Newsted, not

---

[10]The requirement for this notice was announced in Burks v. State, 594 P.2d 771 (Okla. Crim. App. 1979), overruled in part by Jones v. State, 772 P.2d 922 (Okla. Crim. App. 1989).

Mr. Buckley. Pet'r's Ex. P-42, Doc. 42. When the trial commenced, the state did not in fact introduce evidence of the Utah crimes in the first (guilt/innocence) phase of the trial to prove ownership of the gun but did introduce it in the penalty phase to show Mr. Newsted's continuing threat.[11]

On direct appeal, the Oklahoma Court of Criminal Appeals agreed with Mr. Newsted "that the Bill of Particulars contained insufficient notice of the evidence intended in support of the allegation of future dangerousness." Newsted, 720 P.2d at 739. The court concluded, however, that Mr. Newsted failed to demonstrate prejudice from inadequate notice:

> The Burks notice, though technically limited in this case to the first stage of trial, did contain detailed information regarding this unadjudicated offense. We have previously held that proof of an unadjudicated offense is admissible to show the existence of a probability that the accused would commit future acts of violence constituting a continuing threat to society. And, evidence from the first stage of trial is typically incorporated into the punishment phase to provide proof of aggravating circumstances. This is not a case in which counsel was wholly unaware prior to trial of relevant proof regarding an unadjudicated offense. It appears from the record that defense counsel was quite familiar with the facts of the Utah murders, and was able to limit somewhat the damaging effect of the evidence through a probing cross-examination of the State's witnesses.

Id. at 739-40 (citations omitted). The district court agreed: "[c]onsistent with the conclusion of the Oklahoma Court of Criminal Appeals, the Court holds that any

---

[11]The state and Mr. Newsted stipulated that the gun used to kill Mr. Buckley was Mr. Newsted's.

infirmity in Newsted's 'Burks notice' did not constitute a violation of his constitutional rights." Order at 6, R. Vol. III at Tab 36.

Mr. Newsted argues he suffered prejudice from the inadequate notice in two ways: (1) the Utah evidence should have been completely excluded, which would have largely destroyed the state's aggravating evidence in the penalty phase, as it was so focused on the Utah crimes; and (2) he was unable to impeach Ms. Brosemer's testimony with her prior statements. We reject these arguments. We find no prejudice with respect to Mr. Newsted's ability to impeach Ms. Brosemer for the same reason we found no prejudice stemming from the state's failure to turn over to Mr. Newsted all of her prior statements—her testimony at trial did not vary in any meaningful or substantial way from her prior statements. Moreover, Mr. Newsted was able to convey to the jury what he wanted from Ms. Brosemer—that Mr. Newsted did not kill anyone in Utah.

With respect to his first claimed prejudicial effect—the admission of any evidence at all of the Utah crimes—Mr. Newsted seeks too much. He cannot seriously argue that the state was not entitled to introduce that evidence; indeed, the state made clear its intent to use it in the guilt/innocence phase of the trial to establish ownership of the murder weapon. He is complaining about the state's election to use the evidence in the penalty phase instead, to show Mr. Newsted's propensity to commit violent acts. And while he argues, quite correctly, that the

-32-

state should have specifically listed that evidence in its bill of particulars, and not relied on the general statement about the "past behavior of the defendant," he can hardly claim that he was genuinely surprised by the state's decision to rely upon that evidence to establish Mr. Newsted's future dangerousness. And, as both the Oklahoma court and the federal district court found, Mr. Newsted's counsel seemed, from his cross-examination of Ms. Brosemer and Officer Houchen, very knowledgeable about the Utah crimes, and limited, to the extent possible, the damage caused by that testimony. We therefore agree with those courts that Mr. Newsted suffered no prejudice from the state's inadequate notice concerning its intended use of the Utah crimes.

### C. Ineffective assistance of trial counsel

Mr. Newsted argues his trial counsel was constitutionally ineffective in failing to investigate or present any mitigating evidence in the penalty phase of the trial. To prevail on an ineffective assistance of counsel claim, a petitioner must show both deficient performance and prejudice. To show constitutionally deficient performance, Mr. Newsted must show that his attorney "committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness." Castro v. Ward, 138 F.3d 810, 829 (10th Cir. 1998) (quotations omitted). To show

prejudice, he must demonstrate "a reasonable probability that the outcome would have been different had those errors not occurred." Id. (quotations omitted).

The district court held that Mr. Newsted's counsel's complete failure to prepare any mitigating evidence for the penalty phase constituted ineffectiveness. However, it found he suffered no prejudice—that is, he failed to show "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. "In evaluating prejudice, we must keep in mind the strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented." Castro, 138 F.3d at 832 (quotations omitted).

Mr. Newsted alleges the following mitigating evidence should have been presented: (1) evidence of his difficult and troubled childhood, including (a) that his mother was an alcoholic who drank while pregnant with Mr. Newsted; (b) that his father drank heavily and was abusive, including physically and sexually abusive, toward Mr. Newsted's sister; (c) that he ran away from home and began using drugs at age thirteen; and (d) that he dropped out of school at the age of sixteen, married at eighteen, and held several jobs to support his two children; (2) evidence of his severe psychological problems, including his limited mental

capacity, numerous personality disorders, and post-traumatic stress disorder; and (3) that he would not be a continuing threat to society if he served a life sentence in prison because his behavior was exemplary while he was incarcerated in Nevada on a prior conviction.

Mr. Newsted argues that his counsel introduced no evidence at all of these mitigating circumstances. The state argues that evidence of Mr. Newsted's troubled past was introduced, and cites the unpublished denial of his first state post-conviction proceeding, in which the Oklahoma Court of Criminal Appeals found:

> Furthermore, with regard to appellant's assertion that other mitigating evidence was available to show that appellant had a turbulent family background, was a high school dropout, had a long drug history and was functioning between mental retardation and the low end of the average range, we cannot say that there is a reasonable probability that the omission of such evidence would have changed the jury's conclusion. To look back is clairvoyant. Hindsight is never wrong; a trial never has such luxury. Appellant testified the jury heard evidence relating to his prior criminal history, drug abuse and broken marriage. Moreover, defense counsel presented the preliminary hearing transcript from appellant's prior conviction in an attempt to demonstrate appellant's limited involvement.

Appellant's/Cross-Appellees' Reply Br. at 22 (quoting Unpublished Order PC-89-427 at 3-4). The state argues that is a factual finding deserving deference.

In fact, the transcript of the penalty phase reveals that Mr. Newsted specifically declined to testify, although he had testified in the guilt/innocence

phase. His testimony in the guilt/innocence phase did not describe his turbulent family history, although there was testimony by him and his sister concerning his drug use around the time of the Buckley murder, and, in the penalty phase, Ms. Brosemer testified that she and Mr. Newsted, as well as the others involved in the Utah crimes, drank alcohol and took some drugs during the time period of those crimes. Mr. Newsted argues that, pursuant to jury instruction number 10, as well as the court's admonition during the penalty phase, the jury was specifically told to consider only the evidence presented during the penalty phase.

From our review of the record, it appears that Mr. Newsted correctly argues that no mitigating evidence of the type described above was presented during the penalty phase of the trial. Mr. Newsted himself decided not to testify, however, and thus did not avail himself of that opportunity to present such mitigating evidence. Additionally, Mr. Newsted's counsel did introduce an exhibit and argue it was mitigating evidence.[12] We nonetheless agree with the district court that counsel's failure to investigate any other avenues for presenting additional mitigating evidence, in the absence of any tactical reason, constitutes ineffectiveness. We must therefore consider whether Mr. Newsted suffered any prejudice therefrom—whether the virtual absence of such mitigating evidence

---

[12]The exhibit was a transcript of the preliminary hearing in Mr. Newsted's 1979 Nevada conviction, which, Mr. Newsted's counsel argued, demonstrated limited involvement by Mr. Newsted.

creates a reasonable probability that the outcome of the jury's weighing of aggravating against mitigating factors would have been different. We agree with the district court and the Oklahoma state courts that it would not.

The evidence in aggravation was powerful—a series of increasingly violent crimes, culminating in Mr. Newsted killing Mr. Buckley. The fact that Mr. Newsted received a life sentence in Utah is utterly irrelevant to this proceeding. The judge in the Utah case simply determined that the calculus of aggravating and mitigating circumstances, including the fact that Mr. Newsted did not actually kill anyone in Utah, did not warrant the death penalty. In this case, by contrast, Mr. Newsted indisputably killed Mr. Buckley, and the jury was entitled to conclude that the calculus of aggravating and mitigating circumstances in this case did warrant the death penalty. As we observed in <u>Duvall</u>, "[a]lthough grievous, [the defendant's] life history does not automatically mitigate the aggravating circumstances that the jury found present here." <u>Duvall</u>, 139 F.3d at 781. Given that our standard here is to determine whether there is a *reasonable probability* that the jury's determination would have been different, we hold that the absence of the type of mitigating evidence Mr. Newsted argues should have been presented to the jury does not undermine our confidence in the jury's sentence.

**D. Whether the district court should have reached the merits of the heat of passion manslaughter issue**

While the district court found that Mr. Newsted's appellate counsel was constitutionally ineffective in not arguing the trial court's failure to instruct on a heat of passion manslaughter defense, the court ordered a new direct appeal, rather than addressing the merits of the issue. We have held that Mr. Newsted suffered no prejudice from his appellate counsel's ineffectiveness, and in so holding, we addressed the merits of the issue. Thus, the district court's failure to address the merits is of no moment.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's conditional grant of the writ to Mr. Newsted, and we REMAND for entry of an order denying the petition.